**O**

1
2
3
4
5
6
7
8
9
10
11
12

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERALDINE NICHOLSON, et al., | Case No. 15-07594 DDP (RAOx) |
| Plaintiffs, | **ORDER RE: DEFENDANTS CITY OF LOS ANGELES, GUTIERREZ, AND AMARAL'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| CITY OF LOS ANGELES, et al., | |
| Defendants. | [Dkt. 126, 122] |

Presently before the court is the joint Motion for Summary Judgment of Defendants City of Los Angeles, Officer Miguel Gutierrez, and Officer Everado Amaral. Having considered the parties' submissions and heard oral argument, the court adopts the following Order.

**I. BACKGROUND**

Defendants Miguel Gutierrez and Everado Amaral are officers of the Los Angeles Police Department ("LAPD"). (Decl. Gutierrez ¶ 2, Dkt. 122-3). Shortly before 8 o'clock on the morning of February 10, 2015, Officers Gutierrez and Amaral were driving en

route to a roadside memorial for a city police officer. (Decl. Gutierrez ¶ 2; Depo. Gutierrez 24:20-25:1, Dkt. 131-5). It was daylight, and both officers were in plainclothes and driving in an unmarked vehicle. (Decl. Gutierrez ¶ 2). On their way to the memorial, Officer Gutierrez glanced out his passenger side window and saw several people congregated in an alley near the intersection of Florence and 10th Avenues. (Decl. Gutierrez ¶ 4). These people included minor Plaintiffs J.H. and J.N.G., and a third youth, later identified as Michael Sanders, holding what Officer Gutierrez believed to be a gun. (Decl. Gutierrez ¶ 4). At the time of the events, J.N.G. was fifteen years old, and J.H. was seventeen years old. (Decl. J.H. ¶ 2; Decl. J.N.G. ¶ 2).

Earlier that morning, Plaintiffs J.H. and J.N.G. had been hanging out with Sanders and another friend in the alley before school. (Decl. J.H. ¶ 3, Dkt. 131-6; Decl. J.N.G. ¶ 3, Dkt. 131-6). The boys regularly came together in the alley to listen to music, dance, and freestyle rap. (Decl. J.N.G. ¶ 3). That day, all the boys were standing in a circle, within arm's length of each other, dancing and rapping. (Decl. Gutierrez ¶ 4, Decl. J.H. ¶ 4-6). At the time that Officer Gutierrez observed the scene in the alley, Sanders had been holding a toy airsoft gun with an orange tip. (Decl. Gutierrez ¶ 4, 11). J.H. and J.N.G. recall that Sanders was using the toy as a prop while dancing to the beat. (Decl. J.H. ¶ 7; Decl. J.N.G. ¶ 7). Although disputed, J.H. and J.N.G. maintain that Sanders kept the airgun pointed downwards around waist-height and never fired it that morning. (Decl. J.H. ¶¶ 7, 10; Decl. J.N.G. ¶¶ 8-9; Decl. Wooten ¶¶ 6, 7). The boys were students at Alliance Renee and Meyer Luskin College-Ready Academy, located several blocks away from the alley. (Decl. J.N.G. ¶ 3; Decl. J.H. ¶ 3; Decl. Wooten ¶ 2). Before Officer Gutierrez emerged on the scene, the friends had just turned off their music and were preparing to put on their uniforms and head to school. (Decl. J.H. ¶¶10, 15).

Upon driving past the scene in the alley, Officer Gutierrez exclaimed "Gun, gun, gun!" to Officer Amaral. (Decl. Gutierrez ¶ 5). Officer Amaral quickly pulled the vehicle to a stop south of the alley entrance. (Decl. Gutierrez ¶ 6). Without conferring with

Officer Amaral or taking cover, Gutierrez disembarked from the vehicle and ran toward the alley. (Decl. Gutierrez ¶ 6).

As he approached the alley, Officer Gutierrez again saw Sanders holding the toy gun and perceived that it was pointed in the direction of J.H. (Decl. Gutierrez ¶ 7). Plaintiffs contend that Sanders never pointed the gun toward J.H., or any of the other boys that morning. (Decl. J.H. ¶¶ 7, 10; Decl. J.N.G. ¶¶ 8-9; Decl. Wooten ¶¶ 6, 7). Although disputed, Officer Gutierrez reports that he shouted "LAPD, drop your weapon" at Sanders. (Decl. Gutierrez ¶ 4). The parties further dispute whether Sanders turned toward Gutierrez with the gun raised, thereby causing Gutierrez to fire at Sanders. (Decl. Wooten ¶ 7; Decl. Gutierrez ¶ 7).

Officer Gutierrez discharged a volley of three gunshots, one of which struck Plaintiff J.N.G. in the back. (Decl. Gutierrez ¶ 7). J.H. and J.N.G. assert that Gutierrez fired his gun with one hand while running toward them and stopped only once he was several feet away. (Decl. J.H. ¶¶ 16, 17). Gutierrez reports that he stood about twenty-nine feet from Sanders when he fired (Decl. Gutierrez ¶ 7). When Officer Gutierrez fired the shots, Sanders quickly dropped the airgun to the ground. (Decl. Gutierrez ¶ 7; Decl. J.H. ¶ 19, 22). When the shots were fired, J.H. was spraying cologne on his face, and J.N.G. had just begun to put on his school uniform. (Decl. J.N.G. ¶ 15; Decl. J.H. ¶ 15).

Officer Amaral heard the gunshots ring out before he emerged on the scene in the alley. (Depo. Amaral at 39: 15-16, Dkt. 118). After Amaral arrived, he immediately radio-ed for three additional police units (Depo. Amaral at 58: 4-12) and, together with Officer Gutierrez, held all three individuals at gunpoint for several minutes while they waited for police back-up. (Decl. Gutierrez ¶ 8, 9; Decl. J.H. ¶ 35; Depo. Amaral at 57:22-23; 66:15-18). During this period, Officer Amaral discovered that Plaintiff J.N.G. had been shot and requested an ambulance. (Decl. Gutierrez ¶ 9).

The parties dispute whether the officers were able to immediately observe that Sanders had dropped a toy airgun and whether a distance of several feet or more separated the airgun from Gutierrez and Amaral after the shooting, such that the bright

orange tip was in clear view. (Decl. Gutierrez ¶ 8; Decl. J.H. ¶¶ 27, 29). Neither officer attempted to distance the airsoft gun from Sanders or to pick up the gun from where it had fallen on the ground. (Decl. J.H. ¶ 28; Decl. J.N.G. ¶ 27). While on the ground, J.H. shouted to Officer Gutierrez that the gun was "not even a real gun." (Decl. J.H. ¶ 27, 34). In addition, J.H. continually asked the officers "What did we do wrong?" and requested to know why Gutierrez had shot at them. (Decl. J.H. ¶¶ 34, 25). J.H. and J.N.G. report that both officers had dumbfounded countenances on their faces upon realizing that the gun was a toy. (Decl. J.H. ¶ 27; Decl. J.N.G. ¶ 28).

After five to ten minutes, several dozen officers arrived on the scene with weapons drawn. (Decl. J.N.G. ¶ 32). Gutierrez and Amaral directed the additional officers to handcuff and search J.H. and J.N.G. for weapons (Decl. Gutierrez ¶ 9; Decl. J.H. ¶ 33, 37; Amaral Depo. 59:10-17, 71:18-24). J.H. asserts that one LAPD officer violently pressed his knee into his back while handcuffing him, causing pain. (Decl. J.H. ¶ 37). All the officers holstered their weapons once Sanders, J.H., and J.N.G. were handcuffed and searched. (Decl. Gutierrez ¶ 9). A search revealed that none of the youth had any weapons concealed on their person. (Decl. J.H. ¶ 25; J.N.G ¶ 37.) Once the handcuffing and search was completed, Officers Amaral and Gutierrez were separated from the scene of the accident, monitored by supervisors, and had no further contact with J.H. and J.N.G. (Decl. Gutierrez ¶ 10).

Other LAPD officers continued to detain Plaintiffs J.H. and J.N.G. for an investigation into a potential weapons violation. (Depo. Amaral 60:22-24; 62: 3-6). An ambulance arrived to transport Plaintiff J.N.G. to a hospital. (Decl. J.N.G. ¶¶ 36, 38). Except while he was being medically examined, J.N.G. remained in handcuffs for approximately five hours until he was interrogated by police detectives. (Decl. J.N.G. ¶ 40, 42). During his time in the hospital and in police interrogation, J.N.G. requested to speak with, but was denied access to, his mother Plaintiff Geraldine Nicholson. (Decl. J.N.G. ¶ 41). Similarly, Plaintiff J.H. remained in handcuffs for several hours until mid-way through his interrogation by detectives at a police station. (Decl. J.H. ¶ 37, 42).

Plaintiffs maintain that Defendants directed the back-up officers to handcuff and initiate a weapons violation investigation that resulted in their continued detention for hours after the incident. (Depo. Gutierrez, 130:3-6; Depo. Amaral, 78:21-23, 79:2-10).

On the basis of these facts, Plaintiffs J.H., J.N.G, and Nicholson brought suit against the City of Los Angeles, various officials of the LAPD, and Officers Gutierrez and Amaral, alleging various violations of their state and federal rights arising out of the shooting and the subsequent detention. Plaintiffs' First Amended Complaint ("FAC") asserts ten causes of action including, *inter alia*, violations of Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983, intentional infliction of emotional distress, false arrest and false imprisonment, assault and battery, negligence, and the Bane Act, Cal. Civil Code § 52.1.

Defendants Gutierrez, Amaral, and the City of Los Angeles now jointly move for summary judgment on the claims asserted in the FAC.[1]

## II. LEGAL STANDARD

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242 (1986). If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate

---

[1] Subsequent to Defendants' summary judgment motion, Plaintiffs conceded the claims brought in their FAC under the First Amendment, Fifth Amendment, and California Civil Code § 51.7. (Opp. to Def. Gutierrez's MSJ at 17). Defendants City of Los Angeles, Gutierrez, and Amaral's motion for summary judgment is GRANTED with respect to those claims conceded.

that "there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 323.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).*

It is not the court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1278 (9th Cir.1996). Counsel have an obligation to lay out their support clearly. *Carmen v. San Francisco Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found." *Id.*

## III. DISCUSSION

### A. Qualified Immunity

Defendants claim qualified immunity under federal law for those causes of action arising under Section 1983. Reasonable mistakes of law, fact, or both may trigger qualified immunity. *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "'protects' all but the plainly incompetent or those who knowingly violate the law.'" *Green v. Fresno*, 751 F.3d 1039, 1051 (9th Cir. 2014) (citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011)).

The Supreme Court has established a two-prong test to determine whether qualified immunity applies. *Pearson v. Callahan*, 555 U.S. 223, 235-36 (2009). A court must deny qualified immunity when (1) the allegations, if true, amount to a constitutional violation, and (2) the constitutional violation was clearly established at the time. *Id.* In applying the second prong, a court looks to whether "the right at issue was clearly established at the time of the incident, such that a reasonable officer would have understood her conduct to be unlawful in that situation." *Green v. City and County of San Francisco*, 751 F.3d 1039, 1051-52 (9th Cir. 2014) (citation and quotations omitted).

The court applies this federal qualified immunity analysis to each of Plaintiffs' Section 1983 claims below.

### 1. Section 1983 Claims under the Fourth Amendment

Defendants City of Los Angeles, Gutierrez, and Amaral move for summary judgment on Plaintiffs' Section 1983 challenges under the Fourth Amendment. For analytical ease, the court divides its Fourth Amendment analysis of these into two stages: the shooting and the post-shooting events.

### a. Shooting

As a preliminary matter, the parties dispute whether Gutierrez's shots were directed at J.N.G and J.H., rather than at Sanders, who held the airsoft gun. "Violation of the Fourth Amendment requires an intentional acquisition of physical control." *United States v. Al Nasser*, 555 F.3d 722, 728 (9th Cir. 2009) (quoting *Brower v. Cty. of Inyo*, 489 U.S. 593, 596 (1998)). Based on this intentionality principal, Defendants argue that Officer Gutierrez must have had the intent to seize a particular individual, here J.H. or J.H.G., in order for the police encounter to constitute a "seizure" of that individual cognizable under the Fourth Amendment.

This interpretation comports with the Ninth Circuit's analysis in *United States v. Al-Nasser*, 555 F.3d 722 (9th Cir. 2009). There, the Ninth Circuit held that "[a] person is seized when he is 'meant to be stopped by [a particular law enforcement action] ... and [is] so stopped.'" *Al-Nasser*, 555 F.3d at 731 (quoting *Brendlin*, 559 U.S. 249, 261 (2007)).

7

Put differently, "a seizure occurs where a person is stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Id.* (quotations omitted); *see Scott v. Harris*, 550 U.S. 372 (2007) (defining seizure as the "governmental terminal of freedom of movement through means intentionally applied").

Applying this standard, the court concludes that neither J.N.G nor J.H. may bring Fourth Amendment claims as a result of being seized by Officer Gutierrez's gunfire. Plaintiffs have not created a triable issue of fact that Officer Gutierrez intended to use deadly force against J.N.G. or J.H. when it was Sanders who held the airsoft gun.

### b. Post-Shooting Events

J.N.G. and J.H. also raise Fourth Amendment claims related to the events that transpired following the shooting.

### i. Unlawful Arrest

Plaintiffs assert that they were unlawfully arrested after the shooting. "A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1018 (9th Cir. 2015) (quotations omitted). Probable cause exists when, based on the totality of the circumstances known to officers at the time, there is a "fair probability or substantial chance of criminal activity." *Velazquez*, 793 F.3d at 1018. "[A] search or seizure of a person must be supported by probable cause particularized with respect to that person." *Crowe v. Cty. of San Diego*, 608 F.3d 406, 439 (9th Cir. 2000) (quotations omitted).

The requirement of probable cause yields to the lower threshold of "reasonable suspicion" when police officers are engaged in a brief investigatory stop, or *Terry* stop, in which "a police officer observes unusual conduct which leads him to conclude in light of his experience that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). The classification of the seizure—whether an investigatory *Terry* stop or an arrest—will depend upon a host of factors. These include "whether the suspect was handcuffed; whether the police drew their weapons; whether the police physically restrict the

suspect's liberty, including by placing the suspect in a police car; whether special circumstances (such as an uncooperative suspect or risk of violence) are present to justify the intrusive means of effecting a stop; and whether the officers are outnumbered." *Sialoi v. City of San Diego*, 823 F.3d 1223, 1232 (9th Cir. 2016) (quotations omitted). Even when a seizure is considered a *Terry* stop, it must "last no longer than is necessary to effectuate the purpose of the stop." *United States v. Place*, 462 U.S. 696, 709 (1983).

After the gunshots were fired, Officers Gutierrez and Amaral detained J.H., J.N.G., and Sanders for several minutes before additional police arrived. (Decl. Gutierrez ¶ 9; Decl. J.H. ¶ 35). The airsoft gun remained nearby where it had been dropped by Sanders. (Decl. J.H. ¶¶ 28; Decl. J.N.G. ¶¶ 27). Plaintiffs contend that the officers were able to quickly discern that the gun was in fact a toy airsoft gun with a bright orange tip, and not a deadly weapon. (Decl. J.H. ¶¶ 27, 29). When they were apprehended, the youth had backpacks and their school uniforms. (Decl. J.H. ¶ 6, 11; Decl. J.N.G. ¶ 12; Decl. Wooten ¶ 19). While on the ground, J.H. shouted to Officer Gutierrez that the gun was "not even a real gun." (Decl. J.H. ¶ 27, 34). In addition, J.H. continually asked the officers "What did we do wrong?" and asked why Gutierrez had shot at them. (Decl. J.H. ¶¶ 34, 25). Plaintiffs maintain that the officers knew they were mistaken because both had dumbfounded countenances on their faces. (Decl. J.H. ¶ 27; Decl. J.N.G. ¶ 28).

In the immediate aftermath of the incident, the officers may have engaged in an investigatory stop of J.H. and J.N.G. to discern what had transpired. At some point, however, the detention evolved into a full-fledged arrest that required probable cause that J.H. and J.N.G. had been engaged in criminal activity. Once police back-up arrived at the scene, the officers instructed their colleagues to handcuff and search J.H. and J.N.G. (Decl. Gutierrez ¶ 9; Decl. J.H. ¶ 33, 37; Depo. Amaral 59:10-17, 71:18-24). A search revealed that none of the youth had any weapons concealed on their person. (Decl. J.H. ¶ 25; J.N.G ¶ 37.). Even though no weapons were found, both J.H. and J.N.G. remained in handcuffs and under police supervision for hours. Plaintiffs maintain that Defendants

initiated a sham weapons investigation that resulted in their detention long after the dissipation of probable cause.

Taking these facts as true, that Gutierrez decided to pursue an arrest of J.H. and J.N.G. without probable cause that either posed a public danger or had been engaged in any crime, then his actions would run afoul of the Fourth Amendment's protections against unlawful arrest. Moreover, a jury could find that Gutierrez had no "particularized" cause to believe that J.H. and J.N.G, neither of whom had been holding the gun (and one of whom was the suspected crime victim), were engaged in criminal activity. *Crowe*, 608 F.3d at 439.

Defendants counter that, even if they had known that the airsoft gun was a toy, a toy gun could well be mistaken for a real gun and used in the commission of a crime, which would have created probable cause for the arrest. This explanation, however, is undercut by the fact that Sanders, J.H., and J.N.G. were standing in a tight circle within arm's length and facing each other. (Decl. Gutierrez ¶ 4, Decl. J.H. ¶ 4-6). At such close distance, it seems improbable that the orange tip of the airsoft gun would have been hidden from J.H. and J.N.G.'s view, especially if the tip of the gun was pointed at either individual. Although it is questionable under these circumstances that there was probable cause that Sanders had committed a crime with a toy gun, the court does not rule out this theory as a matter of law because an airsoft gun could hypothetically cause injury or be used in the commission of a crime.

Taking all facts in the light most favorable to Plaintiffs, however, a reasonable officer in Gutierrez's position would have known that it was unlawful to detain J.H. and J.N.G. in the absence of probable cause. In *Sialoi v. City of San Diego*, the Ninth Circuit relied upon "well settled" concepts of probable cause to conclude that police officers were not entitled to qualified immunity when they decided to handcuff three youths and "placed them in the back of a police car after learning the [gun] was a toy." 823 F.3d 1223, 1233 (9th Cir. 2016). Although *Sialoi* was not decided at the time of the incident, it relied upon a long line of case law, holding that "[a] person may not be arrested, or must be

released from arrest, if previously established probable cause has dissipated." *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005). In *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007), for example, the Ninth Circuit affirmed that "there may initially be probable cause justifying an arrest, but additional information obtained at the scene may indicate that there is less than a fair probability that the [individual] has committed or is committing a crime. In such cases, execution of the arrest or continuation of the arrest is illegal." In light of this settled law, Gutierrez is not entitled to qualified immunity on Plaintiffs' unlawful arrest claims under the Fourth Amendment.

### ii. Excessive Force

Plaintiffs' excessive force claims under the Fourth Amendment are governed by the "reasonableness" standard enunciated in *Graham v. Connor*, 490 U.S. 386, 397 (1989). Under *Graham*, "[t]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397 (citation omitted). This analysis requires an evaluation of the "totality of the circumstances," which can include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*.

The court finds that there is no constitutional violation here arising from the fact that the officers continued to point guns at Plaintiffs until the scene was secure. Whether officers are constitutionally permitted to draw and point their weapons will, of course, vary with the circumstances of each situation. Here, the chain of events triggering this unfortunate situation was that Sanders exercised poor judgment in carrying a simulated gun in a public place. The risk that Sanders created for himself and those around him cannot be overstated. Simulated deadly weapons carry the clear risk of a deadly confrontation. Because of this aberrant, essentially inexcusably risky conduct by Sanders, the officers cannot be faulted for continuing to point their weapons at all concerned until Sanders and his friends were handcuffed, thus permitting a more deliberate

investigation. The fact that the officers learned relatively early in this encounter that the gun was a simulated gun does not alter this conclusion. As noted previously, simulated guns can be used to commit crimes. Additionally, people who lack the judgment to not appreciate the risk of carrying a simulated gun in public, may also lack judgment in other ways. This could include carrying another weapon, such as a knife, or acting in an unexpected manner. That Plaintiffs J.H. and J.NG. also had guns pointed at them until they could be secured is likewise understandable. The officers were confronted with a situation in which they had little information about the relationship between the participants or exactly what had transpired before shots were fired. Therefore, the court finds the officers did not violate Plaintiffs' constitutional rights by pointing their weapons at J.H. and J.N.G. until they were handcuffed.

However, a different logic may apply if J.H. and J.N.G. remained in handcuffs for longer than was constitutionally permissible. J.N.G. was bleeding from a gunshot wound to his back, yet remained handcuffed for about five hours, including while he was in the ambulance and awaiting treatment at the hospital. (Decl. J.N.G. ¶¶ 36, 38, 40, 42). In addition to being handcuffed to the gurney in the ambulance, J.N.G. was accompanied by an LAPD officer who "maintained a constant surveillance over [him]." (J.N.G. ¶ 38). After being medically examined, J.N.G. was re-handcuffed, which "only exacerbated the pain in [his] back." (Decl. J.N.G. ¶ 40). J.H., the suspected crime victim, was handcuffed for about four hours, including being "left handcuffed to a chair in an interrogation room for hours." (Decl. J.H. ¶ 42, 43). He adds that one LAPD officer violently pressed his knee into his back while handcuffing him, causing pain. (Decl. J.H. ¶ 37). "[B]ecause handcuffing 'substantially aggravates the intrusiveness of a detention,' it follows that circumstances which would justify a detention will not necessarily justify a detention by handcuffing." *Meredith v. Erath*, 342 F.3d 1057, 1063 (9th Cir. 2003); *see also Tekle v. U.S.*, 511 F.3d 839, (9th Cir. 2001); *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994) ("Detentions, particularly lengthy detentions, of the elderly, or of children, or of

individuals suffering from a serious illness or disability raise additional [Fourth Amendment] concerns.").

Here, in the absence of evidence of a violent crime, active resistance, or an immediate safety threat posed by J.H. or J.N.G., *see Graham*, 490 U.S. at 397, a reasonable jury could determine that the sustained handcuffing of J.H. and J.N.G. under the conditions described above constituted excessive force. *See Velazquez v. City of Long Beach*, 793 F.3d 1010, 1025 (9th Cir. 2015) (holding that "[w]here officers are presented with circumstances indicating that no crime was committed, the 'severity of the crime at issue' factor is necessarily diminished as a justification for the use of force"). A reasonable officer in Gutierrez's situation should have known that Plaintiffs' prolonged handcuffing was unlawful when the "circumstances indicat[ed] that no crime was committed," and when neither youth had resisted arrest or posed a safety threat. *Id*. Taking all of these circumstances into consideration, the court finds that Officer Gutierrez is not entitled to qualified immunity on Plaintiffs' excessive force claims.

### iii. Integral Participation

Finally, even though Officer Gutierrez separated from the scene following the handcuffing of J.H. and J.N.G., his actions were integral in Plaintiffs' initial arrest and detention for a potential weapons violation. Section 1983 "extends liability to those actors who were integral participants in the constitutional violation, even if they did not directly engage in the unconstitutional conduct themselves." *Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009). Integral participation means that an officer contributed meaningfully to the action, such as by providing armed back-up or ordering the unconstitutional action. *See id.* at 770, n.11. It does not "require that each officer's actions themselves rise to the level of a constitutional violation." *Id.*

Gutierrez admitted that he ordered the handcuffing of J.H. and J.N.G. (Amaral Depo. 78:21-23; Gutierrez Depo. 130:3-6). In addition, Gutierrez was "aware of the decision" to detain Plaintiffs pursuant to a weapons investigation, "did not object to it," and directly participated in it. *Boyd v. Benton Cty.*, 374 F.3d 773 (9th Cir. 2004). Thus, a

reasonable trier of fact could conclude that, more than a "mere bystander," Officer Gutierrez directed Plaintiffs' arrest, even after probable cause may no longer have existed. *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996).

Conversely, Officer Amaral, who arrived on the scene after the gunshots were fired, was essentially unaware of the details of what had transpired. Therefore, Amaral did not act in violation of the Fourth Amendment in assisting his partner Gutierrez in detaining J.H. and J.N.G. after the shooting.

### 2. Section 1983 Claims under the Fourteenth Amendment

Plaintiffs also bring substantive due process claims under the Fourteenth Amendment as part of their Section 1983 challenge. A substantive due process violation arises when an officer's action "shocks the conscience." *Wilkinson v. Torres*, 610 F.3d 554, 556 (9th Cir. 2010). The "shock the conscience" standard requires that (1) an officer act with deliberate indifference or, (2) if deliberation is impractical under the circumstances, that an officer act with a "purpose to harm . . . unrelated to legitimate law enforcement objectives." *Id.* (quotations omitted). Deliberate indifference occurs when a police officer "disregarded a known or obvious consequence of his action." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011).[2]

In evaluating whether Officer Gutierrez is entitled to qualified immunity under the 14th Amendment, the court finds that a reasonable jury could draw the factual conclusions below:

- Officer Gutierrez observed what he believed to be a firearm displayed by Sanders in close proximity to other individuals. (Decl. Gutierrez ¶ 4).
- Sanders was not engaged in any threatening or menacing behavior, and kept the airsoft gun securely pointed toward the ground. (Decl. J.H. ¶¶ 7, 10; Decl. J.N.G. ¶¶ 8-9; Decl. Wooten ¶¶ 6, 7).

---

[2] Because the court excluded J.H. and J.N.G. from part of the Fourth Amendment analysis under the assumption that they were not "seized" by Officer Gutierrez's shots, *see supra* Part III.A.1.a, the court now engages in the substantive due process analysis as it pertains to his behavior during the shooting.

- The youth, equipped with school uniforms and backpacks, (Decl. J.H. ¶ 6, 11; Decl. J.N.G. ¶ 12; Decl. Wooten ¶ 19), looked to be minors on their way to school and not gang members.
- When they heard the shots ring out, J.H. was spraying cologne on his face, and J.N.G. had just begun to put on his school uniform. (Decl. J.N.G. ¶ 15; Decl. J.H. ¶ 15).
- The incident occurred several blocks away from Plaintiffs' school, (Decl. J.N.G. ¶ 3; Decl. J.H. ¶ 3; Decl. Wooten ¶ 2), and at a time (shortly before 8am) when students could reasonably be expected to be playing outside.
- Neither officer had been responding to recent reports of criminal activity in the area. (Gutierrez Depo. 24:20-25:1; 26:25-27:6).

Taking all facts in the light most favorable to Plaintiffs, nothing other than the suspected presence of a gun in Sanders's hand suggested to Officer Gutierrez that a crime was afoot.[3] "Our case law clearly establishes that the use of deadly force against a suspect simply because he is holding a gun—even when that suspect is in proximity to police officers or other individuals . . . is not *ipso facto* reasonable, particularly when that gun is not pointed at another individual or otherwise wielded in a threatening fashion." *Hughes v. Kisela*, 862 F.3d 775, 789 (9th Cir. 2016), as amended (June 27, 2017) (citations omitted).

This is not to say, of course, that the presence of a gun was not significant. The court does not fault Officer Gutierrez for not recognizing that the gun was a toy during the heat of the encounter. The court understands that Officer Gutierrez believed that the gun posed an imminent threat of death or serious harm to other individuals. Officer Gutierrez then acted as he acted.[4]

_____

[3] The parties dispute whether Sanders' gun was being pointed at anyone, whether Gutierrez delivered a verbal warning, and whether Sanders turned toward Gutierrez before he fired. (*See* Decl. Wooten ¶¶ 5-7).

[4] To avoid these incidents of misidentification, more state legislatures might consider adopting measures to visually distinguish simulated weapons and to ban those colored to look like real guns, which might have avoided these tragedies in the first instance. *See Estate of Lopez by & through Lopez v. Gelhaus*, No. 16-15175, 2017 WL 4183595, at *4 (9th Cir. Sept. 22, 2017) (officer who fatally shot 12-year-old child "realized for the first time that the gun's coloring was different" from a real gun once he was close enough to stand over

Reduced to its essence here, however, all that Officer Gutierrez saw and knew was that there was a gun in the possession of an unknown person (Sanders), who was standing in the presence of other individuals. The court notes that, to the extent that labels may sometimes be useful in designating a general category of cases, the present case and those below are characterized as "minimal information" cases. In cases similar to those presented here, the information known to officers was so minimal that the circumstances required an assessment before the use of deadly force. *See*, *e.g. Gelhaus*, 2017 WL 4183595, at \*8-\*9 (holding that deadly force was unlawful when officer shot 12-year-old boy with a toy gun, although he did not display any intent to use the weapon, which was pointed downward at his side); *George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013) (holding that deadly force was unlawful when, in responding to a domestic disturbance, "deputies shot the sixty-four-year-old decedent without objective provocation while he used his walker, with his gun trained on the ground"); *Shannon v. Cty. of Sacramento*, No. 215CV00967KJMCKD, 2016 WL 1138190, at \*6 (E.D. Cal. Mar. 23, 2016) (holding that deadly force was unlawful when police shot at man walking on the sidewalk cradling an airsoft gun, but who did not pose a safety threat to officers or bystanders); *Gonzales-Guerrero v. City of San Jose*, No. CV12-03541 PSG, 2013 WL 3303144, at \*5 (N.D. Cal. June 28, 2013) (holding that deadly force was unlawful when police shot at costumed partygoer with fake gun painted gold and decorated with glitter).

In minimal information cases, police officers must, and indeed we expect them to, accept a certain amount of the risk inherent in taking sufficient time to gather the information that would make the decision to use deadly force objectively reasonable under the circumstances.[5] Were this not the case, the court suspects there would be more

---

the child); *see* Cal. Penal Code § 16700(4) (mandating that certain airsoft guns, to avoid being considered imitation guns, contain fluorescent markings).

[5] In view of Plaintiffs' submissions, the court has a reasonable basis to believe that that there will be evidence presented at trial that officers are expected to follow their training and assess a situation before the use of deadly force. *See Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc) (holding that a jury may rely on evidence of proper

needless shootings. In noting the above, the court in no way diminishes the fact that police are often requested to make split-second decisions as circumstances evolve.

For example, the court can envision situations where the individual with the gun is lawfully in possession of it, and is defending himself from a robbery or assault. The court finds it impermissible to subject that individual to the risk that, in such situations, the police are entitled to immediately use deadly force. The court is also concerned that permitting an officer to use deadly force under the minimal information known by Officer Gutierrez could put innocent individuals at unreasonable risk of harm. This is particularly true here, in view of the obvious risk of serious injury to J.N.G. or J.H., both of whom stood within arm's length of Sanders.

Finally, that a person possessing a firearm, with no prior knowledge of a police officer's presence, may turn toward an officer shouting a command does not change the analysis. *See Gelhaus*, 2017 WL 4183595, at *17 ("Turning is also the most natural reaction when someone yells in your direction from behind."). If the rule were otherwise, every startled individual who is engaged in defending himself would be placed in jeopardy. Of course, this situation would be different if, for example, the officer knew the individual had a history of violence, or had other particularized information that the individual was about to commit a crime with the firearm.

In light of the above analysis, the court concludes that Officer Gutierrez is not entitled to qualified immunity on J.H. and J.N.G.'s Fourteenth Amendment claims. A finder of fact could conclude that deliberation was practical under the circumstances, and that Gutierrez disregarded the known or obvious risks of injury to J.H. and J.N.G. when he fired at Sanders without taking time to assess the situation.

The court further finds that Officer Amaral's limited actions leading up to the shooting do not constitute a violation of the Fourteenth Amendment. Therefore, unlike

police procedures and practices to determine whether conduct was constitutionally reasonable).

Officer Gutierrez, Officer Amaral is entitled to qualified immunity with respect to Plaintiffs' Fourteenth Amendment claims.[6]

### B. State Law Claims

Defendants Gutierrez, Amaral, and the City of Los Angeles additionally move for summary judgment on each of Plaintiffs' state law claims arising from the same events described above. The court examines each claim in turn, first to determine whether it is subject to state immunity law and then to decide whether there remain triable issues of material fact that would defeat summary judgment.

#### 1. State Immunity Law

"The doctrine of qualified governmental immunity is a federal doctrine that does not extend to state tort claims against government employees." *Venegas v. County of L.A.*, 153 Cal.App.4th 1230 (2007) (quotations omitted). Instead, Defendants raise two provisions, California Civil Code § 815.2(b) and § 821.6, to immunize themselves from liability for claims arising under state law.

The first of these, Section 821.6, provides that "a public employee is not liable for injury caused by his instituting or prosecuting or any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." Section 815.2 complements this provision by adding that, "except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from

---

[6] Defendants also challenge the claim that Plaintiff Geraldine Nicholson was deprived of her rights to familial association under the Fourteenth Amendment because of her inability to contact her child J.N.G. for several hours while he was undergoing treatment for his gunshot wound and interrogated by police detectives. Plaintiffs do not squarely rebut Defendants' challenge to this claim in their briefing. Even had they done so, Gutierrez and Amaral are entitled to qualified immunity on this charge because a reasonable officer would not have known that such behavior "shocked the conscience." Other cases of "shock the conscience" behavior have rested on significantly more extreme circumstances of familial separation. *See, e.g., Kelson v. City of Springfield*, 767 F.2d 651, 654–55 (9th Cir. 1985) (death of child); *Lee v. City of Los Angeles*, 250 F.3d 668, 685–86 (9th Cir. 2001) (two-year separation of child).

liability." Put differently, public entities cannot be held liable for the acts of their employees if the employees have immunity for those acts.

However, these provisions have limited effect in this case. Conceivably, the immunity provision of Section 821.6 might apply to the officers' instigation of the weapons investigation. Yet California public employees, including police officers, are not necessarily immune from suit for false arrest or false imprisonment. *See* Cal. Gov't Code § 820.4; *Sullivan v. County of L.A.*, 12 Cal.3d 710, 721 (1974). Moreover, to the extent other claims are "based . . . on the same facts," "derivative of," or "related to" false arrest claims, then then those claims may survive the immunity hurdle as well. *See Cousins v. Lockyer*, 568 F.3d 1063, 1072 (9th Cir. 2009) (refusing to grant immunity for negligence claims arising from false imprisonment claim). Therefore, Plaintiffs' state claims may proceed, despite § 815.2(b) and § 821.6.

### 2. The Bane Act

The Bane Act, Cal. Civil Code § 52.1, provides a cause of action when a person "interferes [or attempts to interfere] by threat, intimidation, or coercion with the exercise of enjoyment by any individual" of federal or state rights. Coercion must be "independent from the coercion inherent in the wrongful detention itself." *Shoyoye v. County of Los Angeles*, 203 Cal.App.4th 947, 959 (2012). Specifically, such separate and independent coercion is present when "an arrest is unlawful and excessive force is applied in making the arrest." *Bender v. County of L.A.*, 217 Cal.App.4th 968, 978 (2013). Because, as determined above, Plaintiffs J.H. and J.N.G. may have unlawful arrest and excessive force claims against Gutierrez arising under the Fourth Amendment, *see supra* Part III.A.1.c, their Bane Act claim against Gutierrez also survives.

### 3. False Arrest/False Imprisonment

Defendants further move for summary judgment on Plaintiffs' false arrest and false imprisonment claims. In California, false imprisonment is "the unlawful violation of the personal liberty of another." *Asgari,* 15 Cal.4th at 757. More specifically, false imprisonment requires "the nonconsensual, intentional confinement of a person, without

lawful privilege, for an appreciable length of time, however short." *George v. City of Long Beach*, 973 F.2d 706, 710 (9th Cir.1992) (quotations omitted). False arrest is not a separate tort, but merely one manner of committing a false imprisonment. *Collins v. City & Cty. of San Francisco,* 50 Cal.App.3d 671, 673 (1975).

Under California Penal Code § 847(b), a police officer is immune from liability for false imprisonment when, "acting within the scope of his or her authority," she makes a "lawful" arrest or "ha[s] reasonable cause to believe the arrest was lawful." Because a trier of fact may find that Gutierrez's arrest of J.H. and J.N.G. was not lawful under the Fourth Amendment, the court declines to award summary judgment in Gutierrez's favor on false arrest/false imprisonment claims that are predicated on the same facts.

### 4. **Assault and Battery**

The tort of civil battery involves the act of "intentional, unlawful and harmful contact." *Piedra v. Dugan*, 123 Cal.App.4th 1483, 1495 (2004). Battery requires a showing that (1) an officer "intentionally did an act which resulted in a harmful or offensive contact with the plaintiff's person," (2) such act was performed without the plaintiff's consent, and (3) consequent injury or harm. *Id*. The tort of assault has similar elements. *See Yun Hee So v. Sook Ja Shin*, 212 Cal.App.4th 652, 668-69 (2013). Unlike with battery, however, the tort of assault is complete when a plaintiff's anticipation of harm occurs. *Garcia v. City of Merced*, 637 F.Supp.2d 731, 748 (E.D. Cal. 2008).

In the context of a police detention, a plaintiff alleging battery or assault must additionally show that the officer's use of force was "unreasonable" under the circumstances presented. This analysis is similar to the reasonableness inquiry governing federal excessive force claims under the Fourth Amendment. *See Champommier v. United States*, No. CV11-10538-MWF PJWX, 2013 WL 4502069 at *21 (C.D. Cal. Aug. 21, 2013) (applying *Graham* factors to battery claim). The court has already concluded, in the Fourth Amendment context, that Gutierrez's actions may not have been constitutionally reasonable. Therefore, the court denies summary judgment on Plaintiffs' battery and assault claims against Gutierrez.

### 5.  **Intentional Infliction of Emotional Distress**

In California, a plaintiff prevailing on a claim of intentional infliction of emotional distress must establish: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Hughes v. Pair*, 46 Cal.4th 1035, 1050 (2009) (quotations omitted).

The requirement of "extreme and outrageous" conduct closely follows the standard adopted for substantive due process liability under the Fourteenth Amendment. *See Nelson v. City of Davis*, 709 F. Supp. 2d 978, 993 (E.D. Cal. 2010) (citing *County of Sacramento v. Lewis*, 523 U.S. at 847), *aff'd*, 685 F.3d 867 (9th Cir. 2012)). The court determined earlier that Gutierrez's conduct may constitute a Fourteenth Amendment substantive due process violation. For similar reasons, the court finds that Gutierrez's actions may constitute intentional infliction of emotional distress.

### 6.  **Negligence**

To prevail on a theory of negligence under California law, Plaintiffs J.H. and J.N.G. must show that Defendants "had a duty to use due care, that [they] breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes v. Cty. of San Diego*, 57 Cal.4th 622, 629 (2013) (quotations omitted).

As the California Supreme Court elucidated in *Hayes*, state negligence liability "can arise if the tactical conduct and decisions leading up to the use of deadly force show, as part of the totality of circumstances, that the use of deadly force was unreasonable." *Hayes*, 57 Cal.4th at 626. A reasonable trier of fact could find that Officer Gutierrez acted negligently in the events leading to the shooting. *See supra* Part III.A.2. In addition, a reasonable trier of fact could conclude that Gutierrez negligently detained J.H. and J.N.G. after he had determined the gun was a toy, despite lacking any basis to believe the young men were dangerous or involved in criminal activity.

### C.  **Punitive Damages**

Finally, Defendants move for summary judgment on Plaintiffs' punitive damages in their prayer for relief. The court addresses the propriety of punitive damages under both federal law and state law below.

### 1. Federal Law

In a § 1983 action, punitive damages are recoverable against officers sued in their individual capacities when the "conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). As discussed above, a reasonable finder of fact could conclude that Gutierrez acted with reckless disregard to J.N.G. and J.H.'s rights with respect to the shooting. Moreover, a reasonable finder of fact could conclude that Gutierrez deliberately or recklessly prolonged the detention of J.H. and J.N.G without any basis for suspecting that the pair were involved in a crime.

### 2. State Law

Under state law, punitive damages are proper when clear and convincing evidence shows that the defendant acted with oppression, malice or fraud. Cal. Civ. Code § 3294(a). In California courts, the "clear and convincing" standard for punitive damages applies to every stage of the litigation process, including summary judgment. *See Adams v. Allstate Ins. Co.*, 187 F. Supp. 2d 1219 (C.D. Cal. 2002*); Spinks v. Equity Residential Briarwood Apts.*, 171 Cal. App. 4th 1004 (2009). Reviewing the record evidence, the court concludes that a reasonable jury, accepting Plaintiffs' facts as true and making all reasonable inferences in their favor, could find with clear and convincing evidence that Officer Gutierrez acted with "malice, oppression, or fraud," and that Plaintiffs would thereby be entitled to an award of punitive damages.

**IV. CONCLUSION**

For the reasons stated above, Defendant Amaral's Motion for Summary Judgment is GRANTED. Defendants the City of Los Angeles and Officer Gutierrez's Motion for Summary Judgment is GRANTED in part and DENIED in part.[7]

**IT IS SO ORDERED.**

Dated:  October 2, 2017

DEAN D. PREGERSON

UNITED STATES DISTRICT JUDGE

---

[7] Although Defendant City of Los Angeles moved jointly for summary judgment on the FAC, the court finds it premature to opine on the City of Los Angeles' liabilities at this stage in the proceedings, particularly as Defendants have not expressly briefed this issue in their moving papers.